UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DAVID R. MALTZ & COMPANY, INC.,

                Plaintiff(s),

        -against-

WACHOVIA BANK, N.A.,

                Defendant(s).
-------------------------------------------------------------X
WACHOVIA BANK, N.A.,

                Third Party Plaintiff(s),

        -against-

KENNETH A. WELT and KENNETH A.
WELT, P.A.,

                Third Party Defendant(s).
-------------------------------------------------------------X

**MEMORANDUM & ORDER**
CV 07-1049 (WDW)

**APPEARANCES:**

Lazer, Aptheker, Rosella & Yedid
225 Old Country Road
Melville, NY 11747
Russell L. Penzer, Esq., Attorney for Plaintiff

Rosner Nocera & Ragone, LLP
110 Wall Street
New York, NY 10005
John P. Foudy, Esq., Attorney for Defendant/Third Party Plaintiff

**WALL, Magistrate Judge:**

      Before the court, on consent of the parties, is a motion for summary judgment made by

defendant Wachovia Bank, N.A. ("Wachovia") seeking judgment on all claims of plaintiff David

R. Maltz & Company, Inc. ("Maltz"). *See* Docket Entry ("DE") [31]. Maltz has also moved for

partial summary judgment on its cause of action for an account stated. *See* DE [33]. Third party

defendants Kenneth A. Welt and Kenneth A. Welt, P.A. (collectively "Welt") have not submitted

any papers in regard to either motion.  For the reasons set forth herein, Wachovia's motion is granted and Maltz's motion is denied.  In light of the dismissal of plaintiff's case, the third party complaint is also dismissed.

## BACKGROUND

The material facts, drawn from the Complaint, the Third Party Complaint, and the parties' Rule 56.1 Statements, are undisputed unless otherwise noted.

In 2003-04, non-party Daniel E. Marino executed and delivered to Wachovia certain Promissory Notes and Prime Equity Line of Credit Agreements in the aggregate principal amount of $2,900,000.  Those instruments were secured by mortgages on the real property and premises located at 261 Bayberry Lane, Westport, Connecticut (the "Westport property").  The Promissory Notes, Prime Equity Line of Credit Agreements and mortgages will be referred to collectively as the "Subject Mortgages."  Marino defaulted on his obligations, although it is unclear from the submissions when this occurred.  Wachovia commenced a foreclosure action in Connecticut on October 17, 2005.

Prior to Wachovia's filing of the foreclosure action, Marino became the subject of actions commenced by the United States government.  On September 1, 2005, a civil forfeiture action was commenced in the Southern District of New York against entities associated with Marino (the "Bayou Action").  On September 16, 2005, a stipulation and order (the "Bayou stipulation") was entered in this action regarding the disposition of the Westport property.  Under that stipulation, Marino represented that the Westport property was encumbered by liens and mortgages including the Subject Mortgages.  The Bayou stipulation further stated that "the United States and Marino agree that the Westport Property should be sold to preserve its value pending a final adjudication on the merits."  Stipulation & Order p. 2, Foudy Aff., Ex. 23.  It

authorized Marino to sell the property and stated that "outstanding liens, mortgages, and taxes on the property shall be satisfied from the gross proceeds of the sale, subject to the prior approval of the Office." *Id.* ¶2.

On September 29, 2005, the United States government commenced a criminal proceeding against Marino in the Southern District of New York in which it alleged various counts of mail, wire, and investment advisor fraud (the "Criminal Action"). *See* Foudy Aff., Ex. 25.[1] The criminal complaint also contained a forfeiture allegation that specifically listed the Westport property. *Id.* ¶17b. On October 19, 2005, a Preliminary Order of Forfeiture/First Order of Forfeiture was issued in the Criminal Action. *See* Foudy Aff., Ex. 24. According to two Discharge of Lis Pendens provided by Wachovia, the U.S. government recorded a lis pendens in both the Bayou and Criminal Actions. Foudy Aff., Ex. 27.[2]

On November 29, 2005, Wachovia, apparently in response to a request from the U.S. Attorney's Office, provided that Office with a payoff letter indicating a payoff amount of $1,017,716.33 through the end of November to satisfy the Marino loans made by Wachovia. Foudy Aff., Ex. 33. No payoff was made and no sale of the Westport property took place at that time.

Sometime during the winter of 2005-06, the Westport property suffered weather related water and mold damage. In light of this development, Wachovia decided to forego completion of the foreclosure proceeding, and opted instead to attempt to sell the Subject Mortgages.

---

[1]Plaintiff objects to the use of the felony information on the ground that it was "not produced during discovery and not listed in the parties' Joint Pre-Trial Order and therefore is not admissible evidence." Pl. Rule 56.1 Cntr-Stmt, ¶5, DE [35-3].

[2]Plaintiff objects to use of these documents for the same reasons as stated above.

Puckhaber Aff. ¶9.

In April 2006, John Puckhaber, a Senior Vice President at Wachovia, had discussions with third party defendant Kenneth Welt "which resulted in Welt's retention by Wachovia as an independent contractor to market and sell" the Subject Mortgages on Wachovia's behalf. Puckhaber Aff. ¶10. Welt testified that he saw this as an opportunity to do future work with Wachovia. Welt Dep. 23:9-13. On April 10, 2006, Welt sent a letter to Puckhaber to "set down our understandings in regard to the bank's desire to sell their mortgage position" in the Westport property. Puckhaber Aff. Ex. 2. Defendant refers to this letter as the "Letter of Understanding." The relevant portion of the text of this letter follows:

> In summary, the pertinent points are as follows:
>
> •    I will supervise the marketing and sale of the bank's position in the property and oversee the public auction sale which will be held on May 3rd, 2006
> •    I will utilize a sales agent who is qualified and licensed to conduct the sale.
> •    The costs and expenses to market the property will not exceed $10,000.00. Attached is a proposed budget as to these expenditures.
> •    Under no circumstance will the bank be responsible for more than the $10,000.00 regardless if the property is sold.
>
> Minimum Price
>     The minimum price the bank will accept for their position is $1,175,000.00
>     On the date of the sale, a bank's representative will be available to be contacted via telephone. If the sale price obtained is less than the minimum price, it is in the sole discretion of this representative to accept or reject the offer.
>
> Compensation:
>      My compensation and the compensation of my sale agents and staff will be from a buyer's premium to be added to the ultimate sales price. Therefore, it will not be the responsibility of the bank. To reiterate, the maximum financial responsibility of the bank will be the before mentioned $10,000.00.

Ltr of 4/10/06, Puckhaber Aff., Ex. 2. According to Welt, this letter "outlined the total terms and conditions under which I would take the engagement." Welt Dep. 21:1-2. Puckhaber testified that Welt "had a specific duty and the duty was to sell the notes and mortgages." Pl's Ex. E, Puckhaber Dep. 39:21-22. Welt had authority to sell the Subject Mortgages "[u]nder certain directed guidelines." *Id.* 40:24-25.

Upon receipt of Welt's Letter of Understanding, Puckhaber e-mailed him to confirm that the bank's cost would be limited to $10,000 and the purchaser would pay a fee. E-mail of 4/11/06, Puckhaber Aff. Ex. 3. Welt responded "You are correct. The bank's total exposure is limited to $10,000." *Id.*

On May 16, 2006, Welt advised Wachovia that he had retained the services of plaintiff David R. Maltz & Co., Inc. to act as auctioneer in connection with the sale of the Subject Mortgages. Maltz claims that it was retained by Welt on Wachovia's behalf. *See* Pl's Rule 56.1 Statement ("Pl's Stmt"), DE [33-1], ¶3. Welt has testified that "I never told Mr. Maltz that he was being retained by Wachovia. I was retaining Mr. Maltz in order to perform my assignment with Wachovia." Welt Dep. 28-29:25-2. According to Welt, he and Maltz had an oral, not written, agreement. Welt Dep. 59:20-25. None of the parties have provided any terms of this oral agreement.

The propriety of a buyer's premium was discussed between Welt and Maltz. Welt testified that "I told [Maltz] that he could charge a buyer's commission. . . that we would take our commission from the buyer's premium." Welt Dep. 24:6-12. David Maltz also acknowledged that it was a standard in the industry to charge a buyer's premium and the question "was just a matter of do we charge a ten percent buyer's premium or a seven percent buyer's premium, and

[Welt] basically told me I can charge a seven percent buyer's premium." Maltz Dep. 19:17-22.

Prior to the auction, two documents were prepared. Maltz prepared "Bid Instructions" which it forwarded to Welt. Puckhaber Aff., Ex. 5. Welt in turn forwarded the Bid Instructions to Wachovia for its in house counsel to review. E-mail of 5/16/06, Puckhaber Aff., Ex. 5. The Bid Instructions provided in part that "[t]he Successful Bidder shall solely be responsible for the payment to Auctioneer of a buyer's premium in an amount equal to seven percent (7%) of the Successful Bid (the "Buyer's Premium"), which Buyer's Premium shall be paid in addition to the Successful Bid. The Buyer's Premium, together with the Successful Bid, shall constitute the "Purchase Price." [Ex. 5]. This paragraph, according to David Maltz, was "standard in our agreement . . . that was not changed." Maltz Dep. 33:11-13.

The second document prepared prior to the auction was an "Asset Sale Agreement" drafted by Wachovia. Asset Sale Agreement, Puckhaber Aff. Ex. 6. Pursuant to the Asset Sale Agreement, the Subject Mortgages were to be sold "as is," and the sale was to be consummated no later than June 26, 2006 as "[t]ime is of the essence." Asset Sale Agreement ¶II, Puckhaber Aff. Ex. 6. The Asset Sale Agreement also contained language that the purchaser "has consulted with its counsel and advisors regarding this Agreement, the Loans, the Loan Documents and the Pending Action and thereafter made its own, independent evaluation of each and every aspect of this transaction Purchaser deemed material, including . . .(f) the viability or likelihood of success of the Pending Action, and (g) the effect, if any, of the borrower's forfeiture action on the Loans, the Loan Documents and the Pending Action." *Id.* ¶3. The document does not, on its face, define the term "Pending Action."

A public auction was conducted at Maltz's place of business on May 25, 2006. The successful bidder at the auction was Melville Law Center, LLC ("MLC") with a bid of

$1,300,000. MLC comprises several partners of the law firm Lazer, Aptheker, Rosella & Yedid, P.C. ("Lazer Aptheker"). Aptheker Dep. 7:4-13, Foudy Aff. Ex. 35. Lazer Aptheker represented MLC during the events surrounding the auction and unconsummated sale of the Subject Mortgages, and also represents plaintiff in this lawsuit.

Soon after the auction, the U.S. Attorney's office "attempted to intervene and interfere with the Sale" of the Subject Mortgages. Puckhaber Aff. ¶23. On or about June 20, 2006, the U.S. Attorney's Office asked Wachovia if the U.S. Government could purchase the Subject Mortgages upon the same terms that Wachovia was selling them to MLC. Puckhaber Aff., Ex. 7. On June 21, 2006, Steven Aptheker sent a Memorandum to Ken Welt concerning the problems raised by the involvement of the U.S. Attorney's office. Aptheker Memo, Puckhaber Aff. Ex. 8.

By letter dated June 22, 2006, MLC revoked their offer to purchase the Subject Mortgages. Letter of 6/22/06, Puckhaber Aff., Ex. 9. The notice was based in part on MLC's having "recently learned of the Federal criminal forfeiture action . . . pending in the Southern District of New York." *Id.* Counsel for Wachovia responded by letter stating that MLC's assertions were "factually and legally incorrect" and that Wachovia was prepared to close on the date set forth in the Asset Sale Agreement. Letter of 6/23/06, Puckhaber Aff., Ex. 10. Wachovia claimed that the criminal forfeiture action was a matter of public record and was disclosed as part of the Asset Sale Agreement. Puckhaber Aff. ¶25.

Wachovia claims that at this point, "the U.S. Attorney's office then directly interfered with the sale, advising MLC that in the U.S. Attorney's opinion, 'if your client purchases the mortgage, it would not step into Wachovia's shoes for the purposes of the federal forfeiture laws.'" Puckhaber Aff. ¶27, quoting e-mail of 6/26/06, Ex. 11. Based on this representation, MLC concluded that Wachovia was "unable to perform its obligations" under the Asset Sale

Agreement and requested return of its deposit.  Ltr of 6/26/06, Puckhaber Aff. Ex. 11.[3]

On or about August 25, 2006, Wachovia sold the Subject Mortgages to non-party 261 Bayberry Associates LLC for $1,950,000.  Puckhaber Aff. ¶35.  Wachovia further paid the United States government $300,000 in exchange for the release of the lis pendens filed against the Westport property.  *Id.*  Beyond the payment to the government, there is no indication that Wachovia did anything in the two month period between MLC's revocation of its offer to buy in June and the sale in August that  improved its ability to convey the Subject Mortgages.

On or about August 14, 2006, Welt submitted an invoice to Wachovia entitled "Auctioneer's Report of Expenses" in the amount of $9,481.21.  There are three copies of this invoice in the record --  one is not on letterhead, one is on Welt's letterhead, and one is on Maltz's letterhead.  *See* Puckhaber Aff., Exs. 14, 15, 12, respectively.  Apparently, Welt submitted the copy to Wachovia without letterhead first and was asked to resubmit it.  He then submitted the copy on his letterhead.  Since Welt had prepared a "Vendor Classification" tax form filled out in Maltz's name, "Wachovia's account payable procedures required the same entity to be named" on the invoice.  Puckhaber Aff. ¶34.  Welt again submitted the invoice, now on plaintiff's letterhead, and Wachovia paid it in full to Maltz. There is no indication when this payment was made.

On December 22, 2006, Maltz sent a cover letter and invoice to Welt seeking $91,000.  Foudy Aff., Ex. 31.  Both the letter and invoice are on plaintiff's letterhead, are addressed to Welt, and have a line reading "Re: Wachovia Bank."  *Id.*  The invoice seeks $91,000.00 as

---

[3]MLC later commenced an action against Wachovia to rescind the sale and obtain a refund of its deposit.  That action was settled in September 2006.  *See* CV 06-3155 (LDW) Melville Law Center v. Wachovia Bank.

"Auctioneer's Commission (7% commission on $1,300,000.00)." *Id.* According to plaintiff, this second invoice was for "commission due [Maltz] for the successful bid [Maltz] procured at the May 25 2006 auction sale." Pl. Stmt ¶10. Wachovia claims that no commission was due since the sale never closed, and that the party solely responsible for the commission was MLC, the successful bidder. Def. Counter Stmt, ¶10. Maltz never contacted MLC to discuss his buyer's premium. Maltz Dep. 77:8-11.

On or about January 1, 2007, Welt advised Wachovia about Maltz's request for additional monies. In a January 3, 2007 e-mail to Welt regarding Maltz's request for $91,000, Puckhaber of Wachovia indicated that the bank had been willing to close on the transaction and "[t]hus, the request for payment is rejected." Foudy Aff, Ex. 30; *see also* Def's Stmt ¶39. Plaintiff suggests that the "rejection" was insufficient as a matter of law. Pl's Stmt ¶39. Maltz claims that the December 22, 2006 invoice was received, and Wachovia failed to pay it and failed to object to it. Pl. Stmt ¶11. The evidentiary support cited by plaintiff for this statement, however, does not appear in the materials submitted to the court. Wachovia claims that it never received "any invoice addressed to Wachovia" and that it rejected Maltz's request for "additional payments." Def's Counter-Stmt, ¶11.

Maltz commenced this action on March 12, 2007 alleging causes of action for breach of the "Agreement to Sell," fraudulent inducement, account stated, breach of Maltz's exclusive right to broker and sell the Subject Mortgages, and recovery of the reasonable value of its services. Compl. DE [1]. Maltz has moved for partial summary judgment on its cause of action for an account stated. Wachovia has moved for summary judgment dismissing plaintiff's complaint in its entirety. In the alternative, Wachovia seeks an order limiting plaintiff's potential recovery to an amount no greater than allowed by New York General Business Law section 21, or, summary

judgment against Welt for indemnity. Welt has not submitted any papers, either in support of or in opposition to, these motions.

## DISCUSSION

### I. Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc.,* 95 F.3d 123, 128 (2d Cir. 1996). The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine

issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash &*
*Rubbish,* 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at 322). A moving party may obtain
summary judgment by demonstrating that little or no evidence may be found in support of the
non-moving party's case. "When no rational jury could find in favor of the nonmoving party
because the evidence to support its case is so slight, there is no genuine issue of material fact and
a grant of summary judgment is proper." *Marks v. New York Univ.,* 61 F. Supp. 2d 81, 88
(S.D.N.Y. 1999).

The parties cite New York law in support of their arguments. As such, they have
impliedly consented to application of New York law. *See, e.g., Krumme v. WestPoint Stevens
Inc.,* 238 F.3d 133, 138 (2d Cir. 2000).

## II. Defendant's Motion

### A. Breach of Contract

According to the complaint, Maltz was retained by Wachovia to sell the Subject
Mortgages "in return for which, [Maltz] was to receive a commission equal to seven percent of
the sales price obtained for the subject mortgages ("Agreement to Sell")." Compl. ¶6. Wachovia
argues that it entered into an agreement with Welt, not Maltz, that the agreement was only for
payment of expenses up to $10,000, and that "[i]t was specifically agreed that Welt and any sales
agent retained by Welt, (i.e., plaintiff) would solely look to the purchaser for any fee." Def.
Mem. at 11. Plaintiff contends that "Wachovia became liable as a principal under any
agreement between Welt and the plaintiff for the purpose of conducting the sale of the Subject
Mortgages." Pl. Mem. in Opp., at 4, DE [35-4]. Cutting through the various arguments
presented by the parties, two questions are raised: what were the terms of the so-called
Agreement to Sell, and was Wachovia bound by it?

### i. Existence of an Agreement to Sell

It is undisputed that there was no written contract between Wachovia and Maltz, and in addition, there is no evidence of any direct contact between personnel at these two entities, much less communications that could constitute an agreement between them. Any Agreement to Sell, therefore, must arise from the dealings between Maltz and Welt. Indeed, plaintiff states that "any contract entered into by Welt to further the principal's interests in selling the Subject Mortgages subjects Wachovia to liability on the contract." Pl. Mem. in Opp., at 1-2. Assuming for the moment that this statement is true, the court has examined the record to determine the extent of the agreement between Maltz and Welt. Upon this review, the court concludes that there is not a shred of evidence regarding any "agreement" between Welt and Maltz that would mandate payment of the 7% buyer's premium by Wachovia.

Maltz never specifically claims that Welt agreed that it would be paid a commission regardless of whether the sale was completed, and indeed, there is no evidence to support such a claim. To the contrary, all the evidence suggests that Maltz knew that its only compensation, with the exception of its expenses up to $10,000,[4] would be the 7% buyer's premium.

Welt has testified that the agreement between him and Maltz was oral and plaintiff has not provided any evidence to dispute this testimony. Welt testified that, prior to entering into his agreement with Wachovia, he held discussions with David Maltz:

> I recall explaining to Mr. Maltz that this was an opportunity for
> both his company and mine to do future work with Wachovia. . . . I
> told Mr. Maltz that I would like to undertake this assignment with

---

[4]It is clear from the Letter of Understanding, follow-up e-mails, and testimony, that Welt was aware of the $10,000 limitation. David Maltz also testified that the expenses of the sale were limited to $10,000. Maltz Dep. 24:7-14.

> his cooperation and his joint effort. I explained to him that the deal
> I wanted to make was to have Wachovia comfortable with their
> exposure of a maximum of $10,000. I gave him the latitude to
> select the marketing vehicles to be used sine he knew the market.
> And I explained to him that if we did not succeed in liquidating to
> Wachovia's satisfaction, that he and I would only get the $10,000
> and that would go for actual out-of-pocket expenses.
> . . .
> I told him he could charge a buyer's commission, and I recall
> asking him if that's the practice in the Southern District of New
> York . . . that auctioneers are compensated by the buyer's
> commission. He told me that that's how he did it with other
> trustees in the area. I told him that was satisfactory, that we would
> take our commission from the buyer's premium.

Welt Dep. 23:9-23, 24:6-12. David Maltz also testified that he and Welt had discussed his

company's compensation in terms of a buyer's premium, and that it "was just a matter of do we

charge a ten percent buyer's premium or a seven percent buyer's premium, and [Welt] basically

told me I can charge a seven percent buyer's premium." Maltz Dep. 19:17-22.

Although the complaint refers to Maltz's entitlement to a "commission," the evidence

presented makes it clear that the commission took the form of a buyer's premium. When asked

when it was decided that Maltz's compensation would be based upon a buyer's premium, David

Maltz testified that "I think it was mutually agreed." Maltz Dep. 18:22.

The limited documentary evidence also indicates that Maltz expected to be paid by the

buyer. The Bid Instructions prepared by Maltz stated the "Successful Bidder shall be solely

responsible for the payment to Auctioneer of a buyer's premium." Bid Instr. ¶6, Puckhaber Aff.,

Ex. 5. David Maltz testified that this language was "standard in our agreement." Maltz Dep.

33:11-12. In addition, there is evidence that the custom in the industry was for payment of a

buyer's premium. Both Welt and David Maltz testified that a buyer's premium was the standard

in the industry. Welt also testified that the seller never paid the buyer's premium – "In my

experience I cannot recall where the seller paid for the sale of an asset in an auction type setting. The compensation for the professionals comes from the buyer's premium." Welt Dep. 61:5-8. He further testified that in his experience, if the sale was not completed, the auctioneer did not receive a buyer's premium. *Id.* 61:22-25.

Maltz has presented no evidence that, pursuant to any agreement with Welt, it was entitled to be paid by the seller, Wachovia, in the event the sale was not consummated. Nor has it presented any case law in support of an argument that, generally, a seller becomes liable for a buyer's premium if the sale does not take place. *But see* 7 N.Y. Jur. 2d, Auctions and Auctioneers §39 ("The compensation of an auctioneer is usually a matter of private agreement between the auctioneer and the principal and generally is payable only where a sale is completed.").

### ii.  Welt's Authority to Bind Wachovia

There is no evidence of the existence of *any* contract between *any* of the parties under which Maltz is entitled to payment of the buyer's premium from Wachovia. Since there is no agreement, the question of whether Welt had authority to bind Wachovia need not be addressed. Thus defendant's motion for summary judgment on this cause of action is granted.

### B.  Exclusive Right to Sell

Plaintiff also claims that it had an exclusive right to sell the Subject Mortgages at auction. Although plaintiff contends that Wachovia's citation to law regarding exclusivity in real estate broker arrangements is "entirely without merit," Pl. Mem. in Opp. 9, it does not provide even a single citation to law. In the absence of any alternative provided by plaintiff, the court deems it appropriate to employ the principles used in deciding cases of a broker's exclusive right to sell to this case involving an auctioneer's exclusive right to sell.

14

Given the restrictive nature of an exclusive right to sell, a clear statement of the parties' intention to enter into such an arrangement should be required. In cases involving real estate brokers, "[a] contract will not be interpreted as creating an exclusive right to sell unless it 'clearly and expressly provided that a commission was due upon sale by the owner or excluded the owner from independently negotiating a sale.'" *CV Holdings, LLC v. Artisan Advisors, LLC,* 9 A.D.3d 654, 656, 780 N.Y.S.2d 425, 427 (App. Div. 2004) (quoting *Solid Waste Inst. v. Sanitary Disposal,* 120 A.D.2d 915, 916, 502 N.Y.S.2d 835 (App. Div. 1986)). To claim its exclusive right to sell the Subject Mortgages at auction, plaintiff must provide clear evidence that such a right was agreed to by the parties.

Here, there is no written agreement regarding an exclusive right to sell, nor is there any evidence at all regarding an oral representation made to Maltz by anyone that would create such a right. The Letter of Understanding from Welt to Wachovia clearly refers to a single auction: "I will . . . oversee the public auction sale which will be held on May 3rd, 2006;" "On the date of the sale." Ltr., Puckhaber Aff., Ex. 2. When asked whether he requested Maltz to hold a second auction after MLC didn't close its purchase, Welt said no, and added that "[m]y engagement was to expose the property at the sale, with success or failure that would be the end of my engagement. The original engagement letter dated April 10, 2006 did not entail me being involved post auction sale. And since Mr. Maltz was engaged by me, then my involvement and his involvement would cease at the conclusion of the auction sale. We had no provision of what would happen if a subsequent sale took place." Welt Dep. 38-39:25-7.

As there is no evidentiary support whatsoever for a finding that Maltz had an exclusive right to sell, express or otherwise, this claim must be dismissed.

### C. Fraudulent Inducement

Maltz also asserts a claim for fraudulent inducement, alleging that "[i]n an effort to fraudulently induce [Maltz] to enter into the Agreement to Sell, and to hold a public auction for the Subject Mortgages, Wachovia made material misrepresentations and omissions." Compl. ¶30. In its answers to interrogatories, plaintiff identified three particular omissions of information, but no affirmative misrepresentations, by Wachovia: 1) the pendency of criminal and civil forfeiture proceedings in the Southern District of New York; 2) the fact that Wachovia "had engaged in discussions, and the substance of those discussions, with the United States' Attorney's Office for the Southern District of New York regarding the criminal and civil forfeiture actions;" and 3) the fact that Wachovia "unsuccessfully attempted to procure title insurance against any risks associated with the civil and criminal forfeiture actions." Interrog. Resp. 14, Foudy Aff., Ex. 21. In its memorandum in opposition to the motion, plaintiff raises another omission – that Wachovia did not tell it that it had a potential buyer for the Subject Mortgages prior to the auction. Pl. Mem. in Opp. 10-11.

Given the nature of the alleged fraud, plaintiff's cause of action is more properly labeled as one for fraudulent concealment or fraudulent inducement by omission. To establish a cause of action for fraudulent inducement by omission in New York, plaintiff must show: "(1) the opposing party's concealment of information that she had a duty to disclose; (2) the opposing party's intention to defraud, or *scienter;* (3) the pleading party's reliance on his resulting mistaken impression; and (4) damages." *Nash v. The New School,* 2009 WL 1159166, at *3 (S.D.N.Y. Apr. 29, 2009); *see also TVT Records v. Island Def Jam Music Grp.,* 412 F.3d 82, 90-91 (2d Cir. 2005) (cause of action for fraudulent concealment requires 1) failure to discharge a duty to disclose, 2) an intention to defraud or scienter, 3) reliance, and 4) damages).

Plaintiff's claim must fail because, even assuming it could establish the first three factors, an assumption about which the court has serious doubts,[5] it has failed to show that it suffered any damages recoverable under a fraud cause of action. It is clear that "[i]n New York, damages for claims of fraud and fraudulent inducement are subject to the "out-of-pocket rule," which confines plaintiffs to recovering actual losses sustained as the direct result of the wrong alleged, and excludes expected profits." *In re Eugenia VI Venture Holdings, Ltd. Litigation,* 649 F. Supp. 2d 105, 121 (S.D.N.Y. 2008), *aff'd* 2010 WL 1049289 (2d Cir. Mar. 23, 2010). In other words, "[d]amages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud." *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996) (citations omitted).

Maltz claims that it was fraudulently induced to "enter into the Agreement to Sell, and to hold a public auction for the Subject Mortgages." Compl. ¶30. Assuming this allegation to be true, Maltz's remedy would be its out-of-pocket losses to return it to the position it had absent the fraud – compensation for its expenses in holding the auction. It is undisputed that Maltz has already been compensated for those expenses. Since the amounts sought are essentially Maltz's

---

[5]For example, there is no basis for finding that Wachovia had a duty to Maltz. The Second Circuit has "explained that '[d]uring the course of negotiations surrounding a business transaction, a duty to disclose may arise in two situations: first, where the parties enjoy a fiduciary relationship, and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'" *Lerner v. Fleet Bank, N.A.,* 459 F.3d 283, 292 (2d Cir. 2006) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984) (citations omitted)). There was no fiduciary relationship between Maltz and Wachovia, and Maltz has not cited evidence that Wachovia had "superior knowledge" not readily available to Maltz, or that Wachovia knew that Maltz did not have that information.

profit if a sale had been completed, such damages are not available as a remedy on a fraud theory of recovery. Thus, defendant's motion for summary judgment as to this claim is also granted.

### D. Quasi-Contract

In its fourth cause of action, plaintiff claims that it performed substantial services for Wachovia and that it is "entitled to the reasonable value of the services that it provided to Wachovia with respect to the Public Auction." Compl. ¶41. This cause of action is best described as one for quantum meruit or unjust enrichment, although plaintiff does not use those terms. The cause of action arises from a quasi or implied contract and "is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved. The law creates it, regardless of the intention of the parties, to assure just and equitable results." *Tower Int'l, Inc. v. Caledonian Airways, Ltd.,* 969 F. Supp. 135, 138 (E.D.N.Y. 1997) (quoting *Bradkin v. Leverton,* 26 N.Y.2d 192, 196 (1970)). Under New York law, "a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." *Giordano v. Thomson ,* 564 F.3d 163, 170 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC,* 375 F.3d 196, 203 n. 8 (2d Cir. 2004)). New York law allows for the analysis of these claims together as one for quasi-contract because "quantum meruit and unjust enrichment are not separate causes of action." *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir. 2005).

In order to recover for quasi-contract under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.' " *Mid-Hudson Catskill,* 418 F.3d at 175 (quoting *Revson v. Cinque &*

*Cinque, P.C.,* 221 F.3d 59, 69 (2d Cir. 2000)). Under a quasi-contract theory, plaintiff's recovery is limited to the value of the services performed, not alleged lost profits. *See, e.g., Abeles, Inc. v. Creekstone Farms Premium Beef LLC,* 2010 WL 446042, at *10 n. 27 (E.D.N.Y. Feb. 1, 2010); *Collins Tuttle & Co. v. Leucadia, Inc.,* 153 A.D.2d 526, 544 N.Y.S.2d 604 (App. Div. 1989).

Maltz submitted an invoice for its expenses stemming from the auction and that invoice was paid. It has neither claimed nor established that it incurred additional expenses with respect to the auction for which it has not been compensated. The complaint does not seek recovery of lost profits and, as a matter of law, plaintiff would not be entitled to recovery of any such loss. Since plaintiff is barred from recovering its profit on a quasi-contract theory and there is no issue of material fact regarding its expenses from the auction, summary judgment in defendant's favor is appropriate.

## III. Account Stated Cause of Action

Plaintiff has cross-moved for partial summary judgment on its cause of action for an account stated. Defendant has also moved for summary judgment on this claim. According to the complaint, Maltz sent Wachovia "invoices for the Ninety One Thousand ($91,000) Dollar commission that it is owed pursuant to the parties' Agreement to Sell," "Wachovia has not disputed the validity, or the amount, of the invoices sent to it by [Maltz]," and "[a]s a result, Wachovia is liable to [Maltz] for an account stated in the amount of Ninety-One Thousand ($91,000) Dollars." Compl. ¶¶ 34-36.

A cause of action alleging an account stated is distinct from one for breach of contract, and "cannot be utilized simply as another means to attempt to collect under a disputed contract." *Ross v. Sherman*, 57 A.D.3d 758, 759, 870 N.Y.S.2d 383 (App. Div. 2008) (quoting *Simplex*

*Grinnell v. Ultimate Realty, LLC*, 38 A.D.3d 600, 832 N.Y.S.2d 244 (App. Div. 2007)). "Under New York law, an 'account stated' refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *White Diamond Co., Ltd. v. Castco, Inc.*, 436 F. Supp. 2d 615, 623 (S.D.N.Y. 2006) (citations omitted). This promise, which may be express or implied, "must be founded upon previous transactions creating the relationship of debtor and creditor." *Id.*; *see also Nuera Communications, Inc. v. Telron Communications USA, Inc.,* 2002 WL 31778796, at *3 (S.D.N.Y. Nov. 15, 2002) (stating that "a seller must show that the parties agreed to an account based upon prior transactions between them").

It is, however "well settled law that '[a]n account stated assumes the existence of some indebtedness between the parties, or an express agreement to treat the statement as an account stated. It cannot be used to create liability where none otherwise exists." *JP Morgan Chase Bank, N.A. v. Rabel,* 894 N.Y.S.2d 857, 859 (Civ. Ct. 2010) (quoting *M. Paladino, Inc. v. J. Lucchese & Son Contracting Corp.,* 247 A.D.2d 515, 516, 669 N.Y.S.2d 318 (App. Div. 1998)); *see also Nadler v. F & D Assocs., Inc.*, 73 Fed. Appx. 497, 500 (2d Cir. 2003) (quoting *Gurney, Becker & Bourne, Inc. v. Benderson Dev. Co.*, 47 N.Y.2d 995, 996, 420 N.Y.S.2d 212, 394 N.E.2d 282 (1979)). A plaintiff may not "use the mechanism of an account stated claim to circumvent the lack of a contract between the parties." *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,* 637 F. Supp. 2d 185, 197 (S.D.N.Y. 2009). An account stated claim is not viable "[i]n the absence of a claim establishing underlying liability." *Unclaimed Prop. Recovery Serv., Inc. v. UBS PaineWebber Inc.*, 58 A.D.3d 526, 870 N.Y.S.2d 361 (App. Div. 2009). For example, where an individual sends an $18 million invoice for "campaign text and slogan" to the President of the United States, and the President fails to object, the invoice itself cannot create liability and, absent an agreement between them, there is no account stated. *See*

*Bloom v. Democratic Nat'l Comm.,* 2002 WL 31496272, at *3 (S.D.N.Y. Nov. 6, 2002).

Although Maltz claims that it was owed the commission pursuant to the "Agreement to Sell," the court has determined that no such contract existed. Without the agreement, there is no indebtedness on Wachovia's part and Maltz cannot use its presentation of an "invoice" to create liability on the part of Wachovia. Accordingly, plaintiff's claim for an account stated must necessarily fail.

Even crediting plaintiff's argument that Wachovia's payment of the previous invoice for the auction expenses created the necessary debtor-creditor relationship between Wachovia and Maltz, this claim would still fail. "[T]he mere rendering of an account does not make it a stated one." *Rabel*, 894 N.Y.S.2d at 860 (quoting *Lockwood v. Thorne*, 11 N.Y. 170, 175 (1854)). An account may become stated under two circumstances: (1) where the debtor expressly admits it to be correct; and (2) where the party receiving the account makes no objection within a reasonable time. "Agreement to the account stated may be implied 'if a party receiving a statement of account keeps it without objecting to it within a reasonable time.'" *Sidley Holding Corp. v. Ruderman*, 2009 WL 6047187, at * 10 (S.D.N.Y. Dec. 30, 2009) (quoting *Chisholm-Ryder Co., Inc. v. Sommer & Sommer,* 70 A.D.2d 429, 432, 421 N.Y.S.2d 455, 457 (1979)). However, "there can be no account stated where any dispute about the account is shown to have existed." *Candelarie v. Scientific Innovations, Inc.*, 2009 WL 2824727, at *4 (E.D.N.Y. Aug. 28, 2009) (internal quotation omitted).

The invoice in question was transmitted to Wachovia by Welt on January 1, 2007.[6] On January 3rd, Puckhaber responded to Welt in an e-mail stating, in pertinent part, that:

---

[6]The court again notes that it need not determine whether Welt was acting as Wachovia's agent since plaintiff's cause of action cannot stand in any event.

> the Bank's notes/mortgages were offered on an 'as-is/where-is'
> basis without any representations or warranties by the Bank. It was
> the buyer who refused to perform and threatened both you and the
> Bank if its deposit was not returned. At no time did the Bank
> indicate an unwillingness to close on the transaction. <u>Thus, the
> request for payment is rejected.</u>

E-mail of 1/3/07, Puckhaber Aff., Ex. 30 (emphasis added). Although plaintiff claims that

Wachovia never objected to the invoice, David Maltz has admitted that he saw and read this e-

mail. Maltz Dep. 76:13-19. To claim that Wachovia never objected to the invoice is

disingenuous, to say the least.

Defendant's motion for summary judgment on this cause of action is granted, and

plaintiff's cross-motion is denied.

## IV. Third Party Complaint Against Welt

The Third Party complaint filed by Wachovia against Welt asserts four causes of action,

each of which seeks to indemnify Wachovia for any judgment recovered by Maltz. The claims

against Wachovia in the main action having been dismissed in their entirety, the third party

complaint shall be dismissed as well.[7]

---

[7]Although the third party complaint contains a request for attorneys' fees, the court is unaware of any contractual or statutory basis for any such award in this case.

**CONCLUSION**

Defendant Wachovia's motion for summary judgment is granted in its entirety. Plaintiff Maltz's cross-motion on its cause of action for an account stated is denied. The third party complaint is dismissed. The Clerk of the Court is directed to close the case.


Dated:  Central Islip, New York                  **SO ORDERED:**
          March 31, 2010

                                    /s/ William D. Wall
                                    WILLIAM D. WALL
                                    United States Magistrate Judge